07 CIV 8717

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
350 Fifth Avenue, Suite 5508
New York, New York 10118
Telephone: (212) 686-1060
Fax: (212) 202-3827

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
STOR IT, GP, a General Partnership,
INDIVIDUALLY AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED,

               *Plaintiff*,

        vs.

LEHMAN BROTHERS BANK, FSB,

        *Defendant*.

--------------------------------------------------------------X

CASE No.:

CLASS ACTION COMPLAINT

**JURY TRIAL DEMANDED**

Plaintiff, Stor It, GP, a General Partnership, for itself and on behalf of all other persons similarly situated, by its undersigned attorneys, for its complaint against defendant, alleges the following based upon personal knowledge as to itself and its own acts, and information and belief as to all other matters, based upon the investigation conducted by and through its attorneys. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a class action brought by Plaintiff on behalf of all persons and entities in the United States who are now, or were in the past, had applied for, and received a commitment, for a commercial mortgage loan financing with a rate lock agreement, from defendant Lehman Brothers Bank, FSB ("Lehman Bank") from the period of time beginning June 12, 2007 to present and had such loan commitment modified or terminated.  (the "Class Period").  This action is brought against Defendant for breach of the rate lock agreements between defendant and the Class, including Plaintiff.

2.     During the Class Period, Lehman Bank, was contractually obligated to the Class Members, including Plaintiff, to abide by the terms of rate lock agreements it had entered into with Plaintiff and the Class.

3.     Pursuant to such rate lock agreements, Class Members, including Plaintiff, were required make payments to Lehman Bank in order to lock in an interest rate for commercial mortgage financing.

4.     Instead of abiding by the terms of the rate lock agreements, by issuing a loan on the agreed upon terms to Class Members, Defendant in breach of such agreements attempted to renegotiate the rate lock agreement by virtue of offering loans with differing interest rates without any justification whatsoever.

5.     Upon information and belief, the rate lock agreement entered into by Plaintiff, was a uniform rate lock agreement Defendant has utilized in other commercial mortgage financings during the Class Period.

6.     Moreover, pursuant to the rate lock agreements, Defendant was authorized to enter into certain hedging arrangements to offset any losses it might incur in locking the interest rate for such loans, only in the event that the Plaintiff and the Class failed to close the loan according to the terms of the rate lock.

7.     Pursuant to the rate lock agreements, Class Members, including Plaintiff, agreed to cover any hedge losses Defendant would incur during the rate lock period should Plaintiff and Class Members fail to close the loan pursuant to the rate lock.   In relevant part, in the event a loan could not be agreed upon pursuant to a loan application/commitment or that the rate lock agreement was terminated, Defendant was obligated to return to Plaintiff and Class Members all rate lock payments and fees less any hedged losses.

8.     Upon the termination of the rate lock agreement by Defendant on September 19, 2007 (which was caused by Defendant's own failure to abide by the rate lock agreement) Defendant claimed that it suffered hedged losses of $193,215 and stated that Defendant was keeping the rate lock payments Plaintiff had made totaling $160,000 and additional deposits made in the amount of $26,500.

9.     Despite numerous requests by Plaintiff to Defendant for any evidence that Defendant engaged in any hedging activities contemplated by the rate lock agreement or any losses thereto, no such information was provided.

10.     Upon information and belief, Defendant has refused to provide such information because the purported hedged losses are a fiction.   Upon information and belief, Defendant has engaged in such conduct with Class Members during the Class Period.

11.     In breach of the contractual obligations to Plaintiff and the Class (and, upon information and belief, in a manner that furthered its own financial interests), Defendant breached the rate lock agreements by virtue of the fact that (1) Defendant failed to abide by the rate lock agreement; (2) Defendant failed to provide any evidence or accounting or any hedged losses claims; (3) Defendant has wrongfully retained the rate lock payments and other deposits made by Class Members, including Plaintiff; and (4) Defendant has wrongfully used the fiction of a hedge loss to induce the Class to pay a rate higher than the rate that had been locked.

12.     Defendant's breach of contract caused enormous financial harm to Plaintiff and the other Class Members.  Plaintiff has made over $186,500 in deposits and rate lock payments for the loan, and none of said funds have been returned pursuant.

13.     Because the Defendant has similarly breached the rate lock agreements in a similar manner, i.e., refusing to abide to uniform rate lock agreements, refusing to provide an accounting or any evidence of any hedging activities—let alone losses pursuant to the rate lock agreements, wrongfully retaining rate lock payments on hedged losses, and the fact that the contracts are governed by New York law under a contractual choice of law provision, this case is ideally suited for class certification.

## JURISDICTION AND VENUE

14.     Subject matter jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332(d).

15.     The civil class action that was commenced after February 15, 2005 in which the matter in controversy exceeds $5,000,000 exclusive of interests and costs.

16.    Upon information and belief, at least one Class Member is a citizen of a state different than Defendant.  Plaintiff is seeking relief on behalf of a nationwide class and believed class members resided in states throughout the United States.

17.    Upon information and belief, more than two-thirds of the Class Members are not citizens of the state in which the action was filed originally filed.

18.    The principal injuries to the Class were incurred throughout the United States and were not principally incurred in the state where the action was originally filed.

19.    Upon information and belief, New York citizens do not comprise greater than one-third of the plaintiff Class.

20.    Upon information and belief, Defendant is for jurisdictional purposes, a citizen of New York.

21.    Defendant is not a charitable organization.

22.    This claim does not satisfy any of the exemptions to jurisdiction 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005.

23.    Venue is proper in this Judicial District  28 U.S.C. § 1391 because the acts, events, and conduct complained of herein occurred in substantial part in this District.  Defendant has substantial operations and does a significant business within this district and is subject to personal jurisdiction.

24.    Defendant has consented to the jurisdiction as Plaintiff's Loan Application/Commitment, dated June 12, 2007, (the "ACL") for $3,300,000 (the "Loan") and the Plaintiff's Rate Lock Agreement, dated June 15, 2007 (the "Rate Lock Agreement" or "Rate Lock") contain a personal jurisdiction clause that provides this

Court with personal jurisdiction over the Defendant. Specifically, Section K of the ACL states in relevant part:

> Each of Lender [Defendant] and Borrower hereby agrees that any legal proceeding relating to this Application or any Commitment issued hereunder or the transactions contemplated hereby or there by …. shall be maintained in a state or United States Court or competent jurisdiction sitting in the City and State of New York. Lender [Defendant] and Borrower hereby consent and submit themselves to the jurisdiction of the state and the United States courts of New York of the purposes of the adjudication of such legal proceedings.

Upon information and belief, substantially similar jurisdictional clauses were contained in the Class Members ACLs and Rate Lock Agreements.

## PARTIES

25.    Plaintiff Stor It, GP a general partnership, is the owner of commercial property located in Holiday, Florida, for which it sought a loan from Defendant in the manner alleged herein. Stor It, GP's principal place of business is located in Johnson City, TN.

26.    Defendant Lehman Bank is a wholly owned subsidiary of Lehman Brothers, Inc. Lehman bank is a federally-chartered savings bank that with executive offices located at 745 7th Avenue, 7th Floor, New York, New York 10019. Lehman Bank offers traditional and online mortgage banking services to individuals as well as institutions and their customers.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

27.    Plaintiff sues on its own behalf and on behalf of a class of all persons and entities in the United States who are now, or were in the past, had applied for, and received a commitment, for a commercial mortgage loan financing with a rate lock

agreement, from defendant Lehman Brothers Bank, FSB ("Lehman Bank") from the period of time beginning June 12, 2007 to present and had such loan commitment wrongfully modified or terminated. (the "Class Period"). This action is brought against Defendant for breach of the rate lock agreements between defendant and the Class, including Plaintiff.

28.    The members of the Class are so numerous that joinder of all members is impracticable.    Although the precise number of such person is unknown, Plaintiff is informed and believes that there are hundreds if not thousands of class members.

29.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendant's breach of contract.

30.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action litigation.

31.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendant breached their contracts with Plaintiff and other Class Members;

(b)    whether Plaintiff and the other Class members have been damaged by Defendant's conduct; and

(c)    the amount of damages suffered by Plaintiff and the Class.

32.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. There will be no difficulty in the management of this action as a class action.

**Substantive Allegations**

33.    Following negotiations between Plaintiff and defendant Lehman Bank, on June 12, 2007 Plaintiff submitted an Application/Commitment Letter (the "ACL") to Lehman Bank for a first mortgage loan financing in the amount of $3,300,000 secured with a First Mortgage/Deed Of Trust and Assignment of Leases and Rents on a term of 10 years on a properly located at 2262 US 19, Holiday Florida, commonly known as Store It Holiday. (the "Loan").

34.    Other than the loan specific information pertaining to Plaintiff, the ACL was a uniform ACL utilized by Defendant.  A copy of the ACL is attached hereto as Exhibit A.

35.    The interest rate, as set forth in the ACL, was defined as:

The greater of (1) the yield as determined by Lender at the time of Rate Lock, of the Benchmark Treasury (hereinafter defined), (the "Treasury Tiled") plus 130 basis points (the "Applicable Spread") **and (2) 6.30%.**  As sued herein, the term "Benchmark Treasury shall mean the "on-the-run" 10-year U.S. Treasury at the time of Rate Lock, as determined by Lender. (*emphasis and parens. in original*)

36.    The ACL also provided that the interest rate on the Loan was to be determined pursuant to a Rate Lock Agreement acceptable to the Lender in all respects. The ACL states in relevant part:

The procedure for determining the Rate shall be referred t herein as "Rate Lock."

The Rate shall be determined pursuant to a Rate Lock Agreement acceptable to Lender in all respects (the "Rate Lock Agreement").  Lender shall have the right to condition Rate Lock on the satisfaction of some or all conditions to closing set forth herein.

37.    On June 15, 2007 Plaintiff submitted to Lehman Bank a 90 day Rate Lock Agreement dated, June 15, 2007 (the "Rate Lock Agreement" or "Rate Lock").  A copy

of the Rate Lock Agreement is attached hereto as Exhibit B. At that same time Plaintiff paid 2% of the loan amount or $66,000 for the lock.

38.    Pursuant to the Rate Lock Agreement, on June 18, 2007, Plaintiff submitted a Determination Notice confirming the Rate Lock Agreement between the parties. A copy of the Determination Notice is attached hereto as Exhibit C.

39.    Pursuant to the Determination Notice, the Rate was locked in at 6.46% for a loan amount of $3,300,000.

40.    The Rate Lock Agreement obligated Defendant to maintain a fixed interest rate on the Loan between the parties prior to closing of the Loan for a period of 90 days after the Determination Notice Date. In turn, Plaintiff agreed to make an initial Rate Lock Payments and agreed to make additional Rate Lock Payments tied to any increase or decrease to "on-the-run" 10-year U.S. Treasury Yield. Plaintiff also agreed to make per diem Rate Lock Fees as well.

41.    Pursuant to the Rate Lock Agreement, Plaintiff made a series of payments to Defendant on the aforementioned fees and payments. The payments were accepted and retained by Defendant. Ultimately, Plaintiff made total payments of $160,000 to Defendant pursuant to the Rate Lock Agreement and an additional $26,500 pursuant to the ACL.

42.    On August 2, 2007, Plaintiff received a loan commitment from Lehman Bank to the ACL. The commitment was for $3,050,000, rather than the $3,300,000 agreed. The commitment also provided the Rate to be defined as:

> The greater of (1) the yield, as determined by Lender at the time of Rate Lock of Benchmark Treasury (hereinafter defined), (the "Treasury Yield") plus 160 basis points (the "Applicable Spread") **and (2) 6.30%.** As used herein, the term

"Benchmark Treasury" shall mean the "on-the-run" 10-year U.S. Treasury at the time of Rate Lock, as determined by Lender" (*emphasis and parens. in original*)

43.    The August 2, 2007 commitment utilized an Applicable Spread 30 basis points higher than in the ACL.  A copy of this commitment is attached hereto as Exhibit D.

44.    On August 7, 2007 Plaintiff received another commitment to the ACL from Lehman Bank.  This commitment was in all material respects identical to the August 2, 2007 commitment, but provided for 150 basis points for the "Applicable Spread."  A copy of the August 7, 2007 commitment is attached hereto as Exhibit E.

45.    The August 7, 2007 commitment followed Lehman Bank's threats that if Store It did not proceed on the revision that it would be liable for a substantial hedge "unwind" cost well in excess of all of the funds that Store It had advanced to protect it's 6.46% hedged rate.

46.    Store It protested reserving its rights to the 6.46% locked rate and moved forward with its efforts to close the loan.

47.    As the documentation was worked on with Store It's counsel in Florida and title company, it became abundantly clear that Lehman Bank was unwilling to close the Loan pursuant to the agreed upon rate set forth in the Rate Lock Agreement of 6.46%. Despite good faith efforts on part of the Plaintiff to close the deal, Defendant failed to close the Loan pursuant to the rate established by the Rate Lock Agreement.

48.    On September 19, 2007, Plaintiff received a purported notice of termination from Lehman Bank, asserting that Lehman Bank had suffered hedged losses of $193,215 and that Lehman Bank was going to retain the rate lock payments of

$160,000 paid by Plaintiff and other deposits totaling $26,500 to cover such losses and other expenses. A copy of the letter is attached hereto as Exhibit F.

49.     In breach of the Rate Lock Agreement and the ACL, Defendant has failed to produce any evidence of any hedges engaged by Defendant—let alone any evidence of loss. Upon information and belief, there were no hedged losses and Defendant has wrongfully retained Plaintiff's deposit in breach of the Rate Lock Agreement.

50.     Indeed, on September 18, 2007, Lehman Bank's parent, Lehman Brothers Holdings, Inc., reported its results for the Q3 2007, and noted that large valuation gains were made on economic hedges and other liabilities.

51.     As a result of Defendant's actions, Defendant's breached their contracts with Plaintiff and the Class Member and Plaintiff lost approximately $186,500.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

(a) Certifying this action as a Class action on behalf of the proposed Class defined in this Complaint and designating Plaintiff as class representative and named counsel as Class counsel;

(b) Awarding Plaintiff and the Class recover all allowable damages from Defendant;

(c) Awarding Plaintiff attorneys' fees and costs; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 9, 2007                  Respectfully submitted,

                                        **THE ROSEN LAW FIRM, P.A.**

                                        Phillip Kim, Esq.  (PK 9384)
                                        Laurence Rosen, Esq. (LR 5733)
                                        350 Fifth Avenue, Suite 5508
                                        New York, NY 10118
                                        Phone: (212) 686-1060
                                        Fax: (212) 202-3827

                                        Attorneys for Plaintiff

Exhibit A

# APPLICATION/COMMITMENT LETTER

June 12, 2007

Lehman Brothers Bank, FSB
399 Park Avenue
New York, New York 10022
**Attn:** Edmund Moy/Mike Vergura

> **Re:** **Property located at 2262 US 19, Holiday, Florida, commonly known as Store It Holiday (the "Property")**

Ladies and Gentlemen:

Borrower (hereinafter defined) hereby applies to Lehman Brothers Bank, FSB ("Lender") for first mortgage loan financing (hereinafter referred to as the "Loan") on the terms and conditions set forth in this Application/Commitment Letter (this "Application") including, but not limited to, the terms and conditions set forth in Schedule 1 attached hereto. The terms set forth on Schedule 1 are not intended to be all-inclusive. All references herein to "Borrower" shall mean a Single Purpose Entity (as defined herein) controlled by the undersigned.

Unless otherwise indicated in Schedule 2, Borrower hereby represents that it is or will at the time of the closing be the owner of the Property.

A.    **LOAN AMOUNT.**

The Loan Amount shown on Schedule 1 of this Application is the maximum amount of the Loan. The Loan Amount may be reduced, among other reasons, to the extent necessary to satisfy the Minimum Debt Service Coverage Ratio or the Maximum Loan to Value Percentage set forth on Schedule 1.

B.    **COMMITMENT.**

The consummation of the Loan transaction is conditioned upon the issuance by Lender of a mortgage loan commitment substantially in the form annexed hereto as Schedule 3 (the "Commitment") confirming its agreement to make the Loan upon, and subject to, the terms and conditions set forth in this Application. The Commitment may contain such modifications or supplements to the terms and conditions set forth herein as Lender shall determine. In order to proceed with the Loan transaction, Borrower shall be required to return the executed Commitment with any payments required thereby for receipt by Lender within three (3) Business Days after the date of the Commitment and to promptly comply with the terms and conditions thereof. Borrower agrees to accept any Commitment which accepts the terms and provisions of this Application without modification to the terms and conditions set forth herein.

The Lender may issue a Commitment prior to the commencement or completion of its due diligence investigations with respect to the Loan. Lender's issuance of a Commitment shall be within Lender's sole discretion. The issuance of a Commitment shall not constitute evidence of Lender's waiver, determination or approval of any matter or condition relating to the Loan as set forth herein.

C.    CONDITIONS; DUE DILIGENCE INVESTIGATIONS.

In addition to the issuance and acceptance of a Commitment, the closing of the Loan shall be conditioned upon (a) the completion by Lender and Lender's Counsel (hereinafter defined) of such due diligence investigations with respect to Borrower, its principals and the Property as Lender and Lender's Counsel shall deem appropriate (which investigations Borrower acknowledges have not been commenced as of the date hereof), (b) the execution and delivery by Borrower of definitive documentation relating to the Loan, and (c) the absence of any development which could adversely affect the Loan. All such conditions must be satisfied in a manner acceptable to Lender. If a Commitment is issued, Lender shall have the right to condition Rate Lock (as defined in Schedule 1) upon the satisfaction of the foregoing conditions. The provisions of this paragraph are not intended to be limited by any of the other provisions contained herein.

Lender's due diligence investigations shall include, but not be limited to, such physical inspections of the Property as Lender shall deem necessary and the receipt and review of the following items, each of which will be obtained at the expense of Borrower and submitted to Lender in sufficient time for Lender to adequately evaluate its acceptability, and each of which shall be in form and substance satisfactory to Lender: (i) such financial statements, rent rolls, occupancy reports, tenant sales reports (if a retail property), operating and capital budgets, leasing plans, bank statements, pay-off letters, tax returns and other reports regarding Borrower, its principals and the Property as Lender shall deem appropriate; (ii) such references, resumes and credit and other background reports (including "Lexis/Nexis" reports) regarding Borrower and its principals as Lender may request (with such reports to be obtained by Lender, at its option); (iii) a current title report for the Property and a UCC, judgment and lien search with respect to Borrower and the Property (each of which shall include copies of all exceptions and other items referred to therein); (iv) a current survey for the Property certified to Lender and such other persons or entities as Lender shall direct by a licensed surveyor acceptable to Lender; (v) all leases (or, if the Property is a multi-family or self-storage project, a standard form of lease) and reciprocal operating agreements for the Property (including all amendments and guarantees thereof); (vi) unless the Property is a multi-family or self-storage project, estoppel certificates from (1) each tenant under the leases (stating, among other things, that such tenant has taken occupancy of and has commenced its business operations in its entire leased premises and commenced payment of its entire base monthly rent), and (2) as designated by Lender, each other party under any reciprocal easement agreements; (vii) if Borrower's interest in all or any portion of the Property is a leasehold interest pursuant to a ground lease, the related ground lease (including amendments) together with an estoppel certificate from the landlord under the ground lease and, if required by Lender, an agreement from such landlord affording Lender certain protections with respect to the ground lease; (viii) evidence of casualty and liability insurance

2

with respect to the Property and Borrower; (ix) evidence of the compliance of the Property with applicable law; (x) copies of all organizational documents of Borrower and certificates of good standing from applicable governmental authorities with respect to Borrower; (xi) opinions of Borrower's counsel with respect to Borrower, the Property and the loan documentation; (xii) evidence of the absence of litigation affecting Borrower or the Property; (xiii) all agreements pursuant to which Borrower may be acquiring the Property, and all settlement and closing statements with respect thereto and (xiv) certificates and affidavits of Borrower, Guarantors (as defined below) and/or their respective principals with respect to certain of the above items and such other items as Lender may reasonably request. In addition, Borrower shall, at its expense, cause Lender to receive, at the closing of the Loan, a lender's title insurance policy, in form and substance and from a title insurance company satisfactory to Lender, in the amount of the Loan.

Borrower acknowledges that Lender's Counsel (hereinafter defined) shall be retained upon Borrower's submission of this Application with all required Deposits (hereinafter defined), that Lender's due diligence investigations are intended to proceed simultaneously with Lender's Counsel's preparation and scheduling for closing of the Loan, and that Lender's Counsel's activities in this regard shall not be construed as evidence of the waiver or satisfactory completion of such investigations or the agreement by Lender to enter into any financing transaction with Borrower.

D.    LOAN DOCUMENTS.

The definitive documentation for the Loan (the "Loan Documents") shall include (i) a promissory note, (ii) first deed of trust, deed to secure debt or mortgage and security agreement, (iii) an assignment of leases and rents, (iv) UCC financing statements, (v) an assignment of agreements, permits and contracts, (vi) an assignment of management agreement and subordination of management fees (which will also be executed by the property manager for the Property), (vii) if required by Lender, a lead based paint acknowledgment and indemnification agreement, and (viii) if required by Lender, an asbestos operations and maintenance agreement. Each of the Loan Documents will be non-recourse to Borrower, subject to Lender's standard carve-outs and limitations.

An absolute and unconditional guaranty of payment of the carve-outs and limitations with respect to exculpation set forth in the Loan Documents shall be executed jointly and severally by one or more financially secure persons or entities satisfactory to Lender (individually a "Guarantor" and collectively the "Guarantors"), which guaranty shall be in form and substance satisfactory to Lender and Lender's Counsel. As a condition to the closing of the Loan, Lender shall have received financial statements of such Guarantors satisfactory to Lender.

3

The Loan Documents shall also include an Environmental Indemnity Agreement from Borrower and one or more financially secure persons or entities satisfactory to Lender ("Indemnitors"). The Indemnitors shall agree to indemnify Lender (i) for all costs incurred by Lender in connection with the removal of hazardous substances from the Property, regardless of whether or not Borrower caused the presence of such hazardous substances, and (ii) against any loss, cost, damage or expense that Lender may incur, directly or indirectly, as a result of, or in connection with the assertion against Lender of any claim relating to the presence or removal of any hazardous substance on the Property. The indemnities contained in the Environmental Indemnity Agreement shall survive the satisfaction, termination or assignment of the Loan.

The Loan Documents shall provide that upon the occurrence of any default, the Loan shall bear interest at a default rate equal to the lesser of (i) the greater of (A) three percent (3%) plus the Rate, and (B) four percent (4%) plus the Citibank, N.A. base rate or an equivalent rate and (ii) the maximum rate permitted by law.

The Loan Documents shall be governed in accordance with the laws of the state where the Property is located.

E.    BORROWER'S REPRESENTATIONS.

Borrower represents to Lender that there is no action, suit or proceeding, or any governmental investigation or any arbitration, in each case pending or, to the knowledge of Borrower, threatened against Borrower, each Guarantor, its principals or the Property before any governmental or administrative body, agency or official.

Borrower represents to Lender that (i) it has provided and/or will provide to Lender (a) (except for multi-family or self-storage tenants, if applicable) true, correct and complete counterpart executed copies of all leases with tenants at the Property (and all amendments and supplements thereto and agreements collateral thereto including, but not limited to, any guarantees thereof) (collectively, the "Leases"), (b) a standard form of lease for the Property, and (c) a true, complete and correct rent roll of the Property as of the date set forth thereon (the "Rent Roll"), (ii) if previously delivered, the Rent Roll remains true, complete and correct as of the date hereof, (iii) it has neither provided nor received any notices of default with respect to the Leases, (iv) except as noted on the Rent Roll, it knows of no default of the landlord or the tenants under the Leases, (v) all tenants under the Leases are currently in occupancy, paying rent required by their respective leases and conducting operations at the Property, and (vi) it has not been notified, in writing or otherwise, by any tenant of the discontinuance of or intent to discontinue its operations at the Property. The standard form of lease must be satisfactory to Lender. All Leases and the identity of all tenants and guarantors thereof must be consistent with the information set forth in the Rent Roll and satisfactory to Lender.

4

Borrower shall promptly notify Lender of any facts or circumstances which result in a change to the information set forth in the Rent Roll or the representations and warranties set forth in the preceding paragraph. All such changes must be acceptable to Lender. At the closing of the Loan, Borrower shall deliver to Lender (i) a rent roll for the Property dated as of the Closing Date (the "Closing Rent Roll") which shall be consistent in form to the Rent Roll and (ii) a certification of Borrower that the Closing Rent Roll and all Leases theretofore provided to Lender by Borrower are true, correct and complete in all respects. The Closing Rent Roll must be satisfactory to Lender.

Borrower represents that all operating statements, balance sheets and profit and loss statements, federal and state income tax returns, tenant sales figures, budgets, site plans and leasing plans and all other statements, reports and information regarding the Property previously delivered to Lender or which will be delivered to Lender are or will be true, complete and correct in all material respects.

On the Closing Date, Borrower shall certify to Lender whether and to which extent there has been an adverse change in the occupancy of or conduct of business operations at the Property or the business, financial condition or results of operations of Borrower and the Property after the date hereof. Any such adverse change must be acceptable to Lender.

Borrower represents, warrants and covenants that as of the date hereof and at all times hereafter (i) Borrower is not and will not be an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or other retirement arrangement, which is subject to Title I of ERISA or Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), (ii) the assets of Borrower do not and will not constitute "plan assets" of one or more such plans or arrangements for purposes of Title I of ERISA or Section 4975 of the Code, (iii) Borrower is not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA and (iv) transactions by or with Borrower are not and will not be subject to state statutes applicable to Borrower regulating investments of and fiduciary obligations with respect to governmental plans.

The Loan Documents shall contain additional representations and warranties of Borrower concerning Borrower, its constituent partner(s), shareholder(s) or member(s) and the Property.

F.    SINGLE PURPOSE ENTITY.

Borrower and, to the extent required by Lender, Borrower's general partner(s), managing member(s) or principal shareholder(s), as the case may be, shall comply with the Single Purpose Entity requirements set forth in Schedule 1.

5

G.   LENDER'S COUNSEL.

The Loan documentation shall be prepared, and certain of the due diligence investigations outlined above shall be conducted by Stroock & Stroock & Lavan LLP, special counsel for Lender ("Lender's Counsel"), and, to the extent deemed necessary and proper by Lender and Lender's Counsel, local counsel in the State in which the Property is located.

H.   EXPENSES.

Borrower shall simultaneously herewith deposit with Lender the amount set forth on Schedule 1 as the "Deposit." Borrower agrees to pay, upon demand by Lender and in any event prior to closing, all recording fees and taxes and other customary closing costs and all out-of-pocket costs and expenses incurred or to be incurred by Lender in connection with the proposed Loan (including, but not limited to, legal fees and disbursements and the costs of third-party underwriting and due diligence firms ("Underwriting Costs")), to the extent they are estimated by Lender to exceed the sums theretofore paid by Borrower or deposited by Borrower with Lender for such purposes.

I.   TERMINATION.

Lender may, at any time prior to the issuance of a Commitment and at its sole discretion, decline to proceed further with respect to a financing of the Property.

If a Commitment is issued, Lender may, at its option exercised by written notice to Borrower, terminate the Commitment if any of the following events occurs:

(a)   any sale, transfer, pledge, encumbrance or assignment of the Borrower's interest in the Property or of any equitable or beneficial ownership interests in the Borrower, or any agreement is entered into for the purposes of accomplishing the same;

(b)   the occupancy of or conduct of business operations at the Property or the business, financial condition or results of operations of Borrower, any Guarantor, its principals, the Property, any tenant of the Property or any guarantor of any lease of any tenant of the Property suffers any material adverse change after the date hereof or the date of the issuance of any Commitment, or any petition of bankruptcy, insolvency or reorganization is filed by or against any such person or entity, or any tenant of the Property provides notice of its intent to discontinue or possibly discontinue the conduct of its business operations at the Property;

(c)   whether or not covered by insurance, any damage, destruction or alteration occurs with respect to the improvements located upon the Property;

(d)   Borrower breaches any provision contained in this Application or the Commitment;

(e)   Borrower has made any representation or warranty to Lender which was untrue or false when made in a material respect or which becomes untrue or false in a material respect;

6

(f)     any condemnation proceedings are pending or threatened against the Property or any part thereof; or

(g)     the failure of any condition precedent to the closing of the Loan.

Delay in the exercise of Lender's right to terminate the Commitment upon the occurrence of any of the above events, or the occurrence of any of the above events prior to the issuance of a Commitment, shall not be construed as a waiver of such right. The failure of Lender to act in any such event shall not be construed as a waiver of its right to act with respect to any subsequent event of a similar nature. Upon termination as set forth above, all of Lender's obligations pursuant to the Commitment shall cease and be of no further force and effect whatsoever.

Notwithstanding anything contained herein or in the Commitment to the contrary, any Commitment which has not otherwise been terminated in accordance with the terms hereof shall terminate on, and Lender shall have no further obligation thereunder after the date which is 15 days after the date of the Commitment or, if such date is not a Business Day (as defined below), the Business Day preceding such date.

The expiration date of the Commitment may only be extended by a written instrument executed by Lender and Borrower specifically providing for such extension. Borrower acknowledges and agrees that no course of dealing among Lender, Borrower and their respective counsel (including due diligence investigations or the negotiation or exchange of draft or final executed loan documents) prior to or after the date of the issuance or acceptance of the Commitment or the expiration date of the Commitment shall constitute an extension of such expiration date or otherwise form the basis of any claim against Lender.

J.     <u>BROKERS</u>.

Borrower agrees to pay and to indemnify and hold Lender harmless from any and all loss, cost or expense (including attorneys' fees and expenses) arising from the claims of any brokers or anyone claiming a right to any fees in connection with the financing of the Property. Borrower represents to Lender that it has not contracted with, nor does it know of, any broker, other than the broker described on Schedule 1 (if any) (the "Broker"), who has participated in the application for the Loan or the transactions contemplated by this Application. Notwithstanding the foregoing, Borrower shall not be responsible for separate incentive fees or other compensation, if any, owed by Lender to the Broker based on loan origination volume. Borrower acknowledges and agrees that it has made and will make such inquiries of the Broker as it deems necessary with respect to the nature or existence of any such arrangement. No agreement by Lender to pay any such fees or compensation to the Broker shall be binding upon Lender unless it is set forth in a separate written instrument that has been duly executed by Lender and the Broker.

7

K.    <u>MISCELLANEOUS</u>.

This Application, any Commitment issued hereunder and any Rate Lock Agreement or Extended Treasury Lock Agreement (as defined in Schedule 1) shall be governed under the internal laws of the State of New York, without giving effect to principles of conflicts of law.

Wherever pursuant to this Application or any Commitment issued hereunder (a) Lender exercises any right given to it to approve or disapprove, (b) any arrangement or term is to be satisfactory to Lender, or (c) any other decision or determination is to be made by Lender, the decision of Lender to approve or disapprove, all decisions that arrangements or terms are satisfactory or not satisfactory and all other decisions and determinations made by Lender, shall be in the sole and absolute discretion of Lender and shall be final and conclusive, except as may be otherwise expressly and specifically provided herein. All approvals of or waivers by Lender in respect of any of the terms, conditions or requirements of this Application or any Commitment issued hereunder must be in writing. No waiver with respect to any condition, breach or other matter shall extend to or be taken in any manner whatsoever to affect any other condition, breach or matter or affect Lender's rights resulting therefrom.

For the purposes of this Application or any Commitment issued hereunder, (i) the term "Business Day" shall mean any day other than Saturday, Sunday or any other day on which banks are required or authorized to close in New York City, (ii) the singular case shall include the plural and the plural the singular and (iii) the terms "include(s)" and "including" shall mean "include(s), without limitation," and "including, without limitation," respectively.

The Loan Documents will include provisions permitting Lender to freely transfer the servicing for all, or a portion, of its rights in the Loan and shall require Borrower to cooperate in connection with any such transfer. Borrower acknowledges that, without limiting the circumstances in which Lender may transfer the Loan, Lender may transfer the Loan in connection with a securitization involving the Loan and other assets.

Borrower may not assign, transfer or encumber any of its rights pursuant to this Application or any Commitment issued hereunder, directly or indirectly. Any attempt to make such an assignment, transfer or encumbrance shall be null and void.

Borrower hereby waives any right which it may have to a trial by jury in any action brought on this Application or any Commitment issued hereunder or in any way connected with or related to the Loan. Each of Lender and Borrower hereby agrees that any legal proceeding relating to this Application or any Commitment issued hereunder or the transactions contemplated hereby or thereby (including determination of the Rate or the Treasury Yield (as defined in Schedule 1)) shall be maintained in a state or United States court of competent jurisdiction sitting in the City and State of New York. Lender and Borrower hereby consent and submit themselves to the jurisdiction of the state and the United States courts of New York for the purposes of the adjudication of such legal proceedings.

This Application may be signed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

Neither Borrower nor any of its principals shall solicit or negotiate the terms of any mortgage loan or other financing related to any portion of the Property until the date which is the earlier of (i) 60 days after the date hereof, (ii) termination of any Commitment issued by Lender and accepted by Borrower and (iii) the date of issuance of any Commitment by Lender containing modifications to the terms of this Application which are not acceptable to Borrower.

Lender is committed to complying with U.S. statutory and regulatory requirements designed to assist the federal government in combating money laundering and any activity which facilitates the funding of terrorist or criminal activities. The USA PATRIOT Act enhances the money laundering prevention requirements imposed on securities firms and other financial institutions. As part of our customer identification and verification procedures, Lender may ask Borrower and its principals to provide additional information as necessary to verify their identity and comply with these procedures. Until such additional information or documentation is provided, Lender may not be able to effect any transactions for the Borrower or its principals.

THIS APPLICATION IS NOT A COMMITMENT BY LENDER TO LEND (ON EITHER AN EXPRESS OR IMPLIED BASIS) AND DOES NOT IMPOSE ANY OBLIGATIONS ON LENDER. LENDER SHALL ONLY COMMIT TO MAKE A LOAN WITH RESPECT TO THE PROPERTY PURSUANT TO A COMMITMENT SUBSTANTIALLY IN THE FORM ANNEXED HERETO AS SCHEDULE 3 (WITH SUCH MODIFICATIONS OR SUPPLEMENTS TO THE TERMS AND CONDITIONS HEREOF AS LENDER SHALL DEEM APPROPRIATE) WHICH HAS BEEN SIGNED BY LENDER AND COUNTERSIGNED BY BORROWER AND DELIVERED TO LENDER TOGETHER WITH ANY REQUIRED PAYMENTS WITHIN THE TIME PERIOD REQUIRED HEREBY.

EQUAL CREDIT OPPORTUNITY ACT NOTICE

THE FEDERAL EQUAL CREDIT OPPORTUNITY ACT PROHIBITS CREDITORS FROM DISCRIMINATING AGAINST CREDIT APPLICANTS ON THE BASIS OF RACE, COLOR, RELIGION, NATIONAL ORIGIN, SEX, MARITAL STATUS, AGE (PROVIDED THE APPLICANT HAS THE CAPACITY TO ENTER INTO A BINDING CONTRACT); BECAUSE ALL OR PART OF THE APPLICANT'S INCOME DERIVES FROM ANY PUBLIC ASSISTANCE PROGRAM; OR BECAUSE THE APPLICANT HAS IN GOOD FAITH EXERCISED ANY RIGHT UNDER THE CONSUMER CREDIT PROTECTION ACT. THE FEDERAL AGENCY THAT ADMINISTERS COMPLIANCE WITH THIS LAW CONCERNING THIS CREDITOR IS THE OFFICE OF THRIFT SUPERVISION, NORTHEAST REGION, 10 EXCHANGE PLAZA CENTRE, FLOOR 17, JERSEY CITY, NEW JERSEY 07302.

SSL-DOCS1 1096575v4

DISCLOSURE NOTICE

IF BORROWER'S APPLICATION FOR BUSINESS CREDIT IS DENIED, BORROWER SHALL HAVE THE RIGHT TO A WRITTEN STATEMENT OF THE SPECIFIC REASONS FOR THE DENIAL. TO OBTAIN THE STATEMENT, PLEASE CONTACT LEHMAN BROTHERS BANK, FSB, 399 PARK AVENUE, 8th FL., NEW YORK, NEW YORK 10022, ATTENTION: GORDON NICOL, (212) 526-2324, WITHIN 60 DAYS FROM THE DATE YOU ARE NOTIFIED OF OUR DECISION. LENDER WILL SEND BORROWER A WRITTEN STATEMENT OF REASONS FOR THE DENIAL WITHIN 30 DAYS OF RECEIVING BORROWER'S REQUEST FOR THE STATEMENT.

THIS APPLICATION AND ANY COMMITMENT MAY ONLY BE MODIFIED BY A WRITTEN AGREEMENT BETWEEN LENDER AND BORROWER.

THIS APPLICATION, ANY COMMITMENT ISSUED AND ACCEPTED HEREUNDER AND THE OTHER LOAN DOCUMENTS REFERRED TO OR CONTEMPLATED HEREIN REPRESENT OR WILL REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENT OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS OF THE PARTIES.

BORROWER SHALL RETURN THIS APPLICATION TO LENDER TOGETHER WITH ANY DEPOSIT REQUIRED HEREUNDER WITHIN 5 BUSINESS DAYS AFTER THE DATE FIRST SET FORTH IN THIS APPLICATION. LENDER MAY, AT ITS OPTION, RETURN THIS APPLICATION TOGETHER WITH ANY DEPOSITS SUBMITTED HEREWITH IF THIS APPLICATION IS NOT RETURNED WITH THE REQUIRED DEPOSIT WITHIN SUCH PERIOD OF TIME.

Very truly yours,

By: _____
Name: Seth Rincard
Title: President/CEO

**SCHEDULE 1**

| | |
|---|---|
| Loan Amount: | $3,300,000. |
| Security: | To include First Mortgage/Deed of Trust and Assignment of Leases and Rents |
| Term: | 10 years |
| Amortization: | 30 years |
| Rate: | The greater of (1) the yield, as determined by Lender at the time of Rate Lock, of the Benchmark Treasury (hereinafter defined), (the "Treasury Yield") plus 130 basis points (the "Applicable Spread") **and (2) 6.30%.** As used herein, the term "Benchmark Treasury" shall mean the "on-the-run" 10-year U.S. Treasury at the time of Rate Lock, as determined by Lender. |
| | Interest on the Loan shall be calculated by multiplying the actual number of days elapsed in the period for which interest is being calculated by a daily rate based on a 360-day year. |
| Rate Lock: | The procedure for determining the Rate shall be referred to herein as "Rate Lock." |
| | The Rate shall be determined pursuant to a Rate Lock Agreement acceptable to Lender in all respects (the "Rate Lock Agreement"). Lender shall have the right to condition Rate Lock on the satisfaction of some or all of the conditions to closing set forth herein. |
| Required Payments: | Borrower shall be required to pay monthly debt service payments on the eleventh (11th) day of each month during the term of the Loan in amounts equal to that which would completely repay the Loan Amount and interest thereon through constant monthly payments over the Amortization term (based on an assumed 30 day month schedule). All such payments shall be applied first to accrued interest for the preceding Accrual Period (hereinafter defined), and then to principal. If the closing does not occur on the eleventh day of a month, the first |

1

SSL-DOCS1 1096575v4

payment shall be a payment of interest only covering the first Accrual Period collected in advance at the closing. All principal, interest and other sums payable with respect to the Loan shall be due at maturity. As used herein, the term "Accrual Period" shall mean the period commencing on the eleventh (11th) day of a calendar month and ending on the tenth (10th) day of the succeeding calendar month; provided that if the closing of the Loan occurs on other than the eleventh (11th) day of a month, the first Accrual Period shall (i) consist only of the tenth (10th) day of the month, if closing occurs on that date or (ii) commence on the date of closing and end on the next tenth (10th) day of a month.

Good Faith Deposit:

1% of the maximum Loan Amount set forth herein, which will be due and payable to Lender simultaneously with Borrower's acceptance of a Commitment (as a condition to the effectiveness thereof). The Good Faith Deposit is a good faith deposit and shall be refunded to Borrower if (i) the Loan closes in accordance with the terms hereof or (ii) upon Borrower's request, provided Rate Lock has not occurred and Lender receives a release acceptable to Lender; otherwise the Good Faith Deposit shall be retained by Lender.

Defeasance:

After the later to occur of (i) the second anniversary of the date of transfer of the Loan in connection with a securitization involving the Loan or (ii) the fourth anniversary of the Loan closing (the "Defeasance Lock Out Date"), Borrower may cause the release of the Property from the lien of its mortgage or deed of trust by delivery of the Defeasance Deposit (as defined below) to Lender.

As used herein, the term "Defeasance Deposit" shall mean an amount equal to the sum of (1) the amount which will be sufficient to purchase non-callable "government securities" (as defined in Section 2(a)(16) of the Investment Company Act of 1940, as amended ("Government Securities")) in amounts necessary to meet the scheduled payments of principal and interest due on the Loan after the release date (including the payment due on maturity of the Loans), and (2) all fees, costs, taxes and expenses incurred or to be incurred in the purchase of such Government Securities, the substitution thereof as

2

security for the repayment of the Loan and the assumption described below. A substitute borrower shall be established by Lender at Borrower's expense to assume all of Borrower's obligations under the Loan at the time of delivery of such substitute collateral. Except as may be specifically set forth herein, Borrower shall not have any right to prepay all or any portion of the Loan.

Borrower shall only be permitted to prepay the Loan in whole during the last Accrual Period of the term of the Loan. Such prepayment shall be without premium. If such prepayment occurs on a day other than the eleventh (11th) day of a month, Borrower shall also pay all interest which otherwise would have been earned on the outstanding principal balance of the Loan during the then existing Accrual Period had the prepayment not occurred.

| | |
|---|---|
| Minimum Debt Service Coverage Ratio: | **1.20x**, as determined by Lender. |
| Maximum Loan to Value Percentage: | **80%**, based upon the Appraisal (hereinafter defined) and Lender's determination of the current fair market value of the Property. Lender shall review, but not be bound by, the Appraisal in making its determination of the fair market value of the Property. |
| Operating Escrows: | A monthly escrow for taxes, insurance, ground rents (if applicable), water rents and other special assessments will be required. |
| Deposit: | **$26,500**, which includes (1) $10,000 as an advance payment against the anticipated costs of the Third Party Investigations (as described in this Schedule 1, if any), (2) $10,000, as a deposit for the fees and disbursements to be incurred by Lender's Counsel, and (3) $6,500 as a deposit for Underwriting Costs. |

3

Single Purpose Entity:

Borrower shall be a "Single Purpose Entity", which shall mean an entity which does not engage in any business other than owning or operating the Property or acquire or own material assets other than the Property and incidental personal property, and which (a) maintains its assets in a way which segregates and identifies such assets separate and apart from the assets of any other person or entity, (b) holds itself out to the public as a separate legal entity from any other person or entity, (c) conducts business solely in its name, and (d) shall not have any indebtedness other than the Loan and indebtedness for trade payables incurred in the ordinary course of business. In addition, Lender reserves the right to require Borrower to comply with customary rating agency requirements for single purpose entities.

Third Party Investigations:

In addition to the investigations set forth in Section C of this Application, Lender shall, at Borrower's expense, commission a Phase I environmental report and an engineering report by the environmental consultant (the "Environmental Consultant") and the engineer (the "Engineer") selected by Lender. If recommended by the Environmental Consultant in the Phase I report, Lender shall require that a Phase II environmental investigation be performed at Borrowers' expense and that the results thereof be submitted to Lender in a written report. It shall be a condition to the making of the Loan that all investigations and reports of the Environmental Consultant and the Engineer be acceptable to Lender.

Lender shall also commission, at Borrower's expense, a full narrative appraisal of the Property (the "Appraisal") by an appraiser (the "Appraiser") selected by Lender. It shall be a condition to the making of the Loan that the Appraisal be acceptable to Lender.

SSL-DOCS1 1096575v4

Borrower hereby authorizes Lender to engage the Appraiser, the Environmental Consultant and Engineer for the purposes described herein and (a) authorizes the Environmental Consultant, the Engineer and the Appraiser to perform such investigations, contact such persons, entities or governmental authorities and to perform such non-intrusive and intrusive investigations of the Property as they shall deem appropriate, and (b) agrees that Borrower shall not have any claim against Lender relating to the conduct by such persons of such activities or the willful misconduct or negligence of such persons in connection with such activities.

Replacement Reserve:

A monthly escrow deposit equal to 1/12 of an annual Replacement Reserve amount of $.10 per square foot of gross leasable space at the Property will be required. The Replacement Reserve amount may be increased based upon the Engineer's report.

Deferred Maintenance Reserve:

If deferred maintenance costs are identified by the engineering report for the Property delivered to Lender, Lender shall require that Borrower escrow funds equivalent to 125 percent of the deferred maintenance costs as estimated in the engineering report. All such deferred maintenance work shall be required to be completed within sixty (60) days of the closing.

Assumability:

Subject to the prior approval of the holder of the Loan or its agent on a discretionary basis and the payment of a 1% assumption fee.

Additional Encumbrances:

None during the term of the Loan.

Late Charge:

In the event any payment under the Loan becomes overdue, a late charge of five cents ($.05) for each dollar of the amount overdue shall become due and payable to Lender.

5